807 F.2d 383
 55 USLW 2399, 13 Media L. Rep. 1793
 In re WASHINGTON POST COMPANY, Petitioner.
Reporters Committee for Freedom of the Press, Amicus Curiae.
Appeal of WASHINGTON POST COMPANY.
UNITED STATES of America, Appellee,
v.
Michael Agboutui SOUSSOUDIS, Defendant.
Reporters Committee for Freedom of the Press, Amicus Curiae.
Appeal of WASHINGTON POST COMPANY.
UNITED STATES of America, Appellee,
v.
Michael Agboutui SOUSSOUDIS, Defendant.
Reporters Committee for Freedom of the Press, Amicus Curiae.
 Nos. 85-2312, 85-5570 and 86-5502.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 16, 1986.
Decided Dec. 11, 1986.
Rehearing and Rehearing En Banc Denied Feb. 24, 1987.
 
 John H. Rust, Jr. (Anthony W. Hawks, Thomas & Fiske, P.C., Alexandria, Va., on brief) for petitioner.
 Theodore S. Greenberg and David B. Smith (Justin Williams, U.S. Atty., Alexandria, Va., on brief), for appellee.
 Jane E. Kirtley and Elaine P. English, Reporters Committee for the Freedom of Press, Washington, D.C., on brief, for amicus curiae.
 Plato Cacheris and Larry S. Gondelman, Washington, D.C., on brief, for Michael Agboutui Soussoudis.
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 MURNAGHAN, Circuit Judge:
 
 
 1
 The Washington Post Co. asks the Court of Appeals to vacate, retroactively, orders by the United States District Court for the Eastern District of Virginia closing a plea hearing and a sentencing hearing in a criminal case, and to order the district court to unseal the remaining sealed portions of the record of those criminal proceedings. We are asked to decide, first, whether the press and public have a First Amendment right of access to plea and sentencing hearings and to documents submitted in connection with such hearings. Second, if we find that such a right of access exists, we must decide whether the procedural requirements and the substantive standards applied in evaluating the scope of that right should differ when considerations of national security are at stake.
 
 I.
 
 2
 On August 6, 1985, a grand jury indicted Michael A. Soussoudis, a Ghanaian national, on eight counts of espionage. The grand jury charged that Soussoudis had become friendly with a low-level CIA employee stationed in Ghana, and that the employee provided Soussoudis with classified information concerning, among other things, the identity of Ghanaian citizens who covertly worked for the CIA, the identity of American covert personnel in Ghana, Ghanaian dissident activity, and military aid to Ghana from other nations. Soussoudis was arrested when he visited the United States. Soussoudis moved to dismiss the indictment, arguing that the court had no jurisdiction to try him under American law for conduct which had occurred in Ghana and which was legal there. After an open hearing, attended by a number of media representatives, the district court denied Soussoudis' motion.
 
 
 3
 The United States and the government of Ghana then negotiated an agreement whereby Soussoudis would enter a plea of nolo contendere to two counts of the indictment. Subsequent to the imposition of sentence, the parties would jointly move the court, under seal, for an order suspending the sentence. Instead of serving his sentence, Soussoudis would be exchanged for a number of persons allegedly being held in Ghana on charges of spying for the United States. If the exchange were not executed, Soussoudis would have to serve his sentence.
 
 
 4
 On November 18, 1985, the parties filed a joint motion to have Soussoudis' plea taken in camera. The motion was accompanied by the affidavit of Roberta Elkins, an attorney with the Internal Security Section of the Criminal Division of the Justice Department. Both the motion and the affidavit were filed under seal. Elkins' affidavit stated that the plea and sentencing proceedings should be conducted in secret, because disclosure of the proceedings could "jeopardize the success of the exchange and pose a threat to the lives of persons subject to the jurisdiction of the Government of Ghana." In her affidavit, Elkins also requested the court not to list these in camera proceedings on the court docket.[1] The hearing to take Soussoudis' plea was held in camera on the same day, November 18, 1985. It was not reflected on the court docket. At the hearing, the district court orally granted the government's motion, stating that its decision was based on the Classified Information Procedures Act, 18 U.S.C.App. Two days later, on November 20, the court filed a brief written order to the same effect, which explained that the motion was granted "for reasons stated from the bench."
 
 
 5
 In the meantime, The Washington Post had assigned reporter Caryle Murphy to cover the proceedings in Soussoudis' case. On November 18, the day of the plea hearing, the official court docket sheet described the proceedings before the court on that day as a hearing on a motion for a continuance in Soussoudis' case. Murphy attempted to enter the courtroom, but was prevented from doing so by the attending United States Marshal. However, the Ghanaian Ambassador, Eric Otoo, and three other Ghanaian officials were permitted to enter the courtroom and observe the proceedings. Murphy objected to her exclusion, but the court informed her, through the Marshal, that no reason would be given for the closure. On November 20, the Post made a written request to the court reporter for a transcript of the November 18 hearing. The court reporter, acting pursuant to the court's instructions, refused to release the transcript. On the same date, both the Post and the Washington Times published articles speculating that an exchange of spies might be imminent.
 
 
 6
 On November 21, the Post filed a motion in the district court seeking the release of the transcript of the plea hearing and a right to participate in future hearings in the Soussoudis case. The Post requested a hearing on its motion on the following day. The government responded by requesting that the hearing on the Post 's motion be continued until December 6, "due to insufficient time to respond." The district court granted the government's motion. On November 22, the Post filed a petition for a writ of mandamus in this court, as well as a notice of appeal from the district court's order granting the government's motion to hold the plea hearing in camera. However, the proceedings in Soussoudis' case were concluded, and Soussoudis left the country, before this court could hear the Post 's petition.
 
 
 7
 On November 25, the government filed, under seal, a motion to conduct Soussoudis' sentencing in camera and to seal the pleadings and transcripts in the case until further motion by the government. The motion was accompanied by two classified affidavits, those of John C. Whitehead, Acting Secretary of State, and D. Lowell Jensen, Acting Attorney General, which were also filed under seal. The sentencing hearing was held in camera on the same day, November 25, 1985. Again, the hearing was not reflected on the court's docket. The district court granted the government's motion from the bench, again stating only that it relied on the Classified Information Procedures Act. The court did not file a written order. Nevertheless, Murphy, the Post reporter, suspected or had learned that a hearing would be held. She briefly entered the courtroom, accompanied by counsel for the Post, but they were promptly ejected by the Marshal. At the hearing, the district court imposed a 20-year sentence on Soussoudis, then immediately suspended it. Soussoudis was released to the custody of Ambassador Otoo, and he left the United States within twenty-four hours of the sentencing.
 
 
 8
 On November 26, the district court unsealed the transcripts of the plea hearing and the sentencing hearing, as well as several other documents. The Post then petitioned the district court for release of the documents that remained under seal, which included the motion to have Soussoudis' plea taken in camera and the accompanying Elkins affidavit, the motion to have Soussoudis' sentencing conducted in camera, and the Whitehead and Jensen affidavits. At a hearing on that motion, held on December 27, 1985, the government agreed to the release of the two motions and the Elkins affidavit, but objected to the unsealing of the Whitehead and Jensen affidavits. Complying with the government's wishes, the district court denied the Post 's motion. On January 21, 1986, the government declassified the two motions and the Elkins affidavit and made them available to the Post. The Whitehead and Jensen affidavits remain under seal at the present time.
 
 
 9
 The Post filed a notice of appeal from the district court's December 27 order. We consolidated that appeal with the Post 's earlier appeal and petition for mandamus. We subsequently denied the government's motion to dismiss the Post 's appeals and petition on the ground of mootness.[2]
 
 II.
 
 10
 The government makes a preliminary argument that the Post should seek review of the district court's order denying the Post 's motion to unseal the remaining documents by petition for mandamus, rather than by appeal. It is true that some courts have held that a non-party may seek review of a closure order only by mandamus. United States v. Brooklier, 685 F.2d 1162, 1165-66 (9th Cir.1982); CBS, Inc. v. Young, 522 F.2d 234, 237 (6th Cir.1975). Other courts have allowed appeals by non-parties in closure cases. United States v. Chagra, 701 F.2d 354, 358-60 (5th Cir.1983); see United States v. Criden, 675 F.2d 550, 552 (3d Cir.1982).
 
 
 11
 Our own cases, however, have resolved the issue in a manner that obviates any dispute here. In Central South Carolina Chapter, Society of Professional Journalists v. Martin, 556 F.2d 706 (4th Cir.1977), this court held that mandamus is the preferred method of review for orders restricting press activity related to criminal proceedings, but that an appeal would be treated as a petition for mandamus if the party seeking review has standing and has substantially complied with the requirements of Fed.R.App.P. 21(a)[3] concerning mandamus. Id. at 707-08. Because the Post meets both of those requirements,[4] we treat its appeal as a petition for mandamus.
 
 III.
 
 12
 The first question in any case involving a denial of public access to judicial proceedings or materials is whether the First Amendment right of access extends to the type of proceeding or materials to which access is sought. Here, the Washington Post seeks access to a plea hearing and a sentencing hearing, as well as to two affidavits submitted in connection with the government's motion to hold the sentencing hearing in camera.
 
 A. The Hearings
 
 13
 The First Amendment clearly guarantees the right of the press and the public to attend criminal trials. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 558-581, 100 S.Ct. 2814, 2818-30, 65 L.Ed.2d 973 (1980) (plurality opinion); In re Knight Publishing Co., 743 F.2d 231, 233 (4th Cir.1984). In Press-Enterprise Co. v. Superior Court (Press-Enterprise I), 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), the Court indicated that the right of access assured by the First Amendment also extends to at least some kinds of pre-trial proceedings in criminal cases. In particular, on the facts of that case, the Court held that the First Amendment right of access applies to voir dire proceedings for the selection of jurors.[5] Because the Court appeared to treat voir dire proceedings as a part of the trial itself, however, some courts subsequently expressed uncertainty as to whether the right of access extended to pre-trial proceedings that could not arguably be said to be part of the trial. See, e.g., In re Application of The Herald Co., 734 F.2d 93, 98 (2d Cir.1984). That uncertainty has been resolved by the Supreme Court's recent decision in Press-Enterprise Co. v. Superior Court (Press-Enterprise II), --- U.S. ----, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), which makes clear that the First Amendment right of access extends to at least some pre-trial hearings that cannot arguably be found to be part of the trial. There, the Court held that the access right extends to preliminary hearings held to determine whether there is probable cause to go to trial. Several of the federal courts of appeals have also found a First Amendment right of public access to a variety of pre-trial proceedings in criminal cases. In particular, a First Amendment access right has been found with respect to hearings concerning the suppression of evidence, In re Application of The Herald Co., 734 F.2d 93, 99 (2d Cir.1984); United States v. Brooklier, 685 F.2d 1162, 1169-71 (9th Cir.1982); United States v. Criden, 675 F.2d 550, 554-57 (3d Cir.1982), and bail hearings, United States v. Chagra, 701 F.2d 354, 363-64 (5th Cir.1983).
 
 
 14
 In deciding whether the First Amendment right of access extends to a particular kind of hearing, both the Supreme Court and the courts of appeals have looked to two factors: historical tradition and the function of public access in serving important public purposes. In the first inquiry, the court asks whether the type of proceeding at issue has traditionally been conducted in an open fashion. In the second inquiry, the court asks whether public access to the proceeding would tend to operate as a curb on prosecutorial or judicial misconduct and would further the public's interest in understanding the criminal justice system. Press-Enterprise II, --- U.S. at ----, 106 S.Ct. at 2739-43; Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 605-06, 102 S.Ct. 2613, 2619-20, 73 L.Ed.2d 248 (1982); United States v. Brooklier, 685 F.2d 1162, 1167, 1170 (9th Cir.1982); United States v. Criden, 675 F.2d 550, 555-57 (3d Cir.1982).
 
 
 15
 Examination of the decided cases leads us to conclude that the First Amendment right of access extends to hearings of the type involved here. We note, first of all, that both plea hearings and sentencing hearings arguably fall within the scope of the right of access to criminal trials, which is clearly guaranteed by Richmond Newspapers and Globe Newspaper Co. Because the taking of a guilty plea serves as a substitute for a trial, it may reasonably be treated in the same manner as a trial for First Amendment purposes. Sentencing may also be viewed as within the scope of the criminal trial itself. Sentencing can occur before the termination of the trial proceeding, and, even if it occurs in a separate hearing, it clearly amounts to the culmination of the trial. Moreover, even if plea hearings and sentencing hearings are not considered a part of the trial itself, they are surely as much an integral part of a criminal prosecution as are preliminary probable-cause hearings, suppression hearings, or bail hearings, all of which have been held to be subject to the public's First Amendment right of access.
 
 
 16
 In addition, historical and functional considerations weigh in favor of finding a First Amendment right of access here. Sentencings have historically been open to the public; while plea hearings do not have the same long tradition, they are typically held in open court. As to both, public access serves the important function of discouraging either the prosecutor or the court from engaging in arbitrary or wrongful conduct. The presence of the public operates to check any temptation that might be felt by either the prosecutor or the court to obtain a guilty plea by coercion or trick, or to seek or impose an arbitrary or disproportionate sentence.
 
 B. The Affidavits
 
 17
 The Supreme Court has not yet addressed the question whether the First Amendment right of access also applies to written documents submitted in connection with judicial proceedings which themselves implicate the right of access. However, at least two courts of appeals have held that First Amendment concerns extend to such documents. United States v. Smith, 776 F.2d 1104, 1111-1112 (3d Cir.1985); Associated Press, Inc. v. United States District Court, 705 F.2d 1143, 1145 (9th Cir.1983). In Smith, the Third Circuit found that the public's First Amendment right was implicated in the sealing of a bill of particulars filed in a criminal prosecution. In Associated Press, a case where fear of publicity had led the district judge to place all documents related to the case under seal, the Ninth Circuit held that the First Amendment right of access extends to "pretrial documents in general."
 
 
 18
 We have not yet had occasion to decide whether the First Amendment access right extends to documents. In In re Knight Publishing Co., 743 F.2d 231 (4th Cir.1984), we found it unnecessary to reach the First Amendment question, because we held that the district court had improperly denied the press its common-law right of access to judicial records and documents.[6] As the opinion in Knight Publishing made clear, the same procedures are required for the evaluation of both common-law and First Amendment access claims. We find it necessary to consider the First Amendment issue today, however, because the present case raises substantive questions as well as procedural ones. The common law does not afford as much substantive protection to the interests of the press and public as the First Amendment does. Under the common law, a trial court's denial of access to documents is reviewed only for abuse of discretion. Nixon v. Warner Communications, Inc., 435 U.S. 589, 597-99, 98 S.Ct. 1306, 1311-13, 55 L.Ed.2d 570 (1978); In re Knight Publishing Co., 743 F.2d at 235. Under the First Amendment, on the other hand, such a denial must be " 'necessitated by a compelling government interest, and ... narrowly tailored to serve that interest.' " Press-Enterprise I, 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984), quoting Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982). Because we conclude that the more rigorous First Amendment standard should apply in this context, we hold that the First Amendment right of access applies to documents filed in connection with plea hearings and sentencing hearings in criminal cases, as well as to the hearings themselves.
 
 IV.
 
 19
 The mere existence of a First Amendment right of access to a particular kind of hearing or document does not entitle the press and public to access in every case. Access may be denied if "closure is essential to preserve higher values and is narrowly tailored to serve that interest." Press-Enterprise I, 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984); see also Globe Newspaper Co. v. Superior Court, 457 U.S. at 606-07, 102 S.Ct. at 2619-20. In making that determination, the district court must comply with certain procedural requirements.
 
 
 20
 In In re Knight Publishing Co., 743 F.2d 231 (4th Cir.1984), we explained the procedures that must be followed "as prerequisites to a closure order in a criminal proceeding." Id. at 235. First, the district court must give the public adequate notice that the closure of a hearing or the sealing of documents may be ordered. In particular, closure motions must be "docketed reasonably in advance of their disposition so as to give the public and press an opportunity to intervene and present their objections to the court." Id. at 234. Moreover, although individual notice is generally not necessary, "when the district court has been made aware of the desire of specific members of the public to be present, reasonable steps to afford them an opportunity to submit their views should be taken before closure." Id. Second, the district court must provide interested persons "an opportunity to object to the request before the court ma[kes] its decision." Id. at 235. Third, if the district court decides to close a hearing or seal documents, "it must state its reasons on the record, supported by specific findings." Id. at 234. Its findings must be specific enough to enable the reviewing court to determine whether closure was proper. In addition, the court must state its reasons for rejecting alternatives to closure. Id. at 235. The Supreme Court has added the weight of its authority to some of these requirements: although the Court has not addressed the question of notice, it has held that a district court's closure order must be supported by a clear statement of reasons, with specific findings, including a discussion of possible alternatives considered and rejected by the court. Press-Enterprise I, 464 U.S. 501, 510-11, 104 S.Ct. 819, 824-25, 78 L.Ed.2d 629 (1984).
 
 
 21
 The government argues, however, that these requirements should not apply where national security interests are at stake. In such cases, the government contends, the district court should have discretion to adapt its procedures to the specific circumstances, and may properly defer to the judgment of the executive branch. We disagree. While we recognize, and share, the government's concern that dangerous consequences may result from the inappropriate disclosure of classified information, we do not believe that adherence to the procedures outlined in Knight Publishing would create an unacceptable risk of such disclosure. A district court considering a motion for the closure of hearings for national security reasons need not divulge the facts of the situation to persons seeking access to the hearings. Where a request for the sealing of documents has been made, the district court need not disclose the contents of the documents prior to making its decision. In re Knight Publishing Co., 743 F.2d at 235 n. 1. All that the district court must do is to provide interested persons with notice of the government's motion and an opportunity to voice their objections.[7] There is no reason to fear that these procedures would in themselves alert the public to the substance of the information sought to be kept secret.[8] Moreover, if the court concludes that a denial of public access is warranted, the court may file its statement of the reasons for its decision under seal. Cf. In re the Application of the Herald Co., 734 F.2d 93, 101 (2d Cir.1984) (suggesting that the district court's statement of reasons for closing a suppression hearing could be filed under seal).
 
 
 22
 We note further that, troubled as we are by the risk that disclosure of classified information could endanger the lives of both Americans and their foreign informants, we are equally troubled by the notion that the judiciary should abdicate its decisionmaking responsibility to the executive branch whenever national security concerns are present. History teaches us how easily the spectre of a threat to "national security" may be used to justify a wide variety of repressive government actions. A blind acceptance by the courts of the government's insistence on the need for secrecy, without notice to others, without argument, and without a statement of reasons, would impermissibly compromise the independence of the judiciary and open the door to possible abuse. Accordingly, we hold that the procedural requirements set forth in Knight Publishing are fully applicable in the context of closure motions based on threats to national security.
 
 
 23
 The district court here, in making its decisions to close the November 18 and November 25 hearings in Soussoudis' case, plainly failed to comply with those procedural requirements. No notice of either of the government's two closure motions was given to the public. Instead, the district court deliberately concealed the motions from the public by causing the omission from the court's docket of any mention of either the motions or the hearings to which they referred. Moreover, when the Post nonetheless learned of the closure of the plea hearing and sought to voice its objections, the district court denied it any meaningful opportunity to be heard by delaying consideration of its request until after the conclusion of the proceedings which the Post desired to attend. Finally, the court failed to provide an adequate statement of the reasons for its closure decisions. The court's only explanation of its November 18 decision was the following statement made from the bench:
 
 
 24
 THE COURT: Very well. Based on the representations that you have made and the joint motion that I have here to proceed under the Classified Information Procedures Act, and the affidavit that has been presented, the motion will be granted and this plea will be taken in camera.
 
 
 25
 The court's explanation of its November 25 decision to close Soussoudis' sentencing hearing was similar:
 
 
 26
 THE COURT: All right, the motion to hold this hearing in camera is granted under the Classified Information Procedures Act as stated. And I will hear what you gentlemen have to say.
 
 
 27
 These brief statements failed to include specific findings concerning the interests at stake, a discussion of the applicable constitutional principles, or a consideration of possible alternatives to closure.
 
 
 28
 The district court also failed to comply with the Knight Publishing procedures in making its decision to seal the Jensen and Whitehead affidavits. Again, interested persons were afforded neither notice nor an opportunity to be heard. The belated December 27 hearing on the Post 's motion to unseal the documents does not cure the lack of an opportunity for a hearing with respect to the original decision to seal them. Moreover, the court prepared no statement of reasons at all at the time of its original decision. The court's explanation at the December 27 hearing, where it stated only that its denial of the Post 's motion was based on the Classified Information Procedures Act, suffered from the same defects as its statements with respect to the closed hearings.
 
 V.
 
 29
 We also find that the district court's actions were improper on substantive as well as procedural grounds. The Supreme Court's recent decision in Press-Enterprise II, --- U.S. ----, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) makes clear that criminal proceedings may be closed to the public without violating First Amendment rights only if (1) closure serves a compelling interest; (2) there is a "substantial probability" that, in the absence of closure, that compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect that compelling interest. Moreover, the court may not base its decision on conclusory assertions alone, but must make specific factual findings. Id. at ----, ----, 106 S.Ct. at 2741-43, 2743-44; see also Press-Enterprise I, 464 U.S. 501, 510-11, 104 S.Ct. 819, 824-25, 78 L.Ed.2d 629 (1984); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581, 100 S.Ct. 2814, 2829-30, 65 L.Ed.2d 973 (1980).[9]
 
 
 30
 The district court here failed to engage in the required three-part constitutional analysis. Instead, the district court relied solely on the Classified Information Procedures Act to support its determinations. The district court's approach was erroneous for two reasons. First, even if the Classified Information Procedures Act purported to resolve the issues raised here, the district court would not be excused from making the appropriate constitutional inquiry. The district court may not simply assume that Congress has struck the correct constitutional balance; when the constitutionality of a statute is challenged in federal court, that determination is ultimately the province of the courts and not of the legislative branch.
 
 
 31
 Second, the Classified Information Procedures Act is simply irrelevant to the issues raised here. As we have previously explained, that Act "was enacted by Congress to combat the growing problem of graymail, a practice whereby a criminal defendant threatens to reveal classified information during the course of his trial in the hope of forcing the government to drop the criminal charge against him." United States v. Smith, 780 F.2d 1102, 1105 (4th Cir.1985). Because the government had no opportunity to obtain an advance ruling concerning the admissibility of such classified information, prosecutors frequently chose to abandon criminal proceedings rather than risk the disclosure of the information at trial. Congress, concerned by the prosecutors' dilemma, see S.Rep. No. 96-823, 96th Cong., 2d Sess. 1-4, reprinted in 1980 U.S.Code Cong. & Ad.News 4294-98, enacted the Classified Information Procedures Act to "provide[ ] pretrial procedures that will permit the trial judge to rule on questions of admissibility involving classified information before introduction of the evidence in open court." Id. at 1, 1980 U.S.Code Cong. & Ad.News at 4294. Under Sec. 6 of the Act, the district court may hold an in camera hearing for the purpose of making such advance evidentiary determinations. The Act does not purport to authorize district courts to hold in camera hearings for other purposes. Thus, it is plainly inapposite here.
 
 VI.
 
 32
 Although writs of mandamus are to be issued only in extraordinary circumstances, Platt v. Minnesota Mining & Manufacturing Co., 376 U.S. 240, 245, 84 S.Ct. 769, 772, 11 L.Ed.2d 674 (1964), we believe that such circumstances are present in this case.
 
 
 33
 We accordingly issue a writ vacating the district court's November 18 and November 25 orders closing the hearings in Soussoudis' case. We note that our decision does not signify that we conclude that those hearings should have been opened to the public, but simply that we cannot uphold orders based on the use of impermissible procedures and the application of an erroneous standard of law. Under normal circumstances, we would remand the issue to the district court for a second consideration using correct procedures and correct substantive standards. Such a course would be pointless here, where the hearings have already been held. Accordingly, we simply vacate the orders.
 
 
 34
 We also vacate the district court's December 27 order denying the Post 's motion to unseal the remaining sealed documents. We remand this aspect of the case to the district court with instructions to reconsider the matter applying the constitutional standards discussed above, and to support its decision with a clear statement of reasons, accompanied by specific findings and a discussion of possible alternative choices.
 
 
 35
 VACATED IN PART AND REMANDED IN PART.
 
 
 
 [1]
 We note that this procedure failed to comply with Fed.R.Civ.P. 7(b)(1), which provides that "[a]n application to the court for an order shall be by motion."
 
 
 [2]
 The Post 's attempt to obtain the release of the Whitehead and Jensen affidavits is, of course, still very much alive. With respect to the district court's denial of access to the hearings, we note that controversies over the exclusion of the press from judicial proceedings are matters that are "capable of repetition yet evading review," and thus do not become moot even after the proceedings have terminated. Globe Newspaper Co. v. Superior Court, Norfolk County, 457 U.S. 596, 602-03, 102 S.Ct. 2613, 2617-18, 73 L.Ed.2d 248 (1982); In re Knight Publishing Co., 743 F.2d 231, 233 (4th Cir.1984)
 
 
 [3]
 Rule 21 provides:
 Rule 21. Writs of Mandamus and Prohibition Directed to a Judge or Judges and Other Extraordinary Writs
 (a) Mandamus or Prohibition to a Judge or Judges; Petition for Writ; Service and Filing. Application for a writ of mandamus or of prohibition directed to a judge or judges shall be made by filing a petition therefor with the clerk of the court of appeals with proof of service on the respondent judge or judges and on all parties to the action in the trial court. The petition shall contain a statement of the facts necessary to an understanding of the issues presented by the application; a statement of the issues presented and of the relief sought; a statement of the reasons why the writ should issue; and copies of any order or opinion or parts of the record which may be essential to an understanding of the matters set forth in the petition. Upon receipt of the prescribed docket fee, the clerk shall docket the petition and submit it to the court.
 
 
 [4]
 The Post meets the standing requirement because it has suffered "an injury ... 'that is likely to be redressed by a favorable decision.' " South Carolina Chapter, Society of Professional Journalists, 556 F.2d 706, 707-08 (4th Cir.1977), quoting Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)
 
 
 [5]
 The Fourth Circuit independently arrived at the same conclusion with respect to voir dire proceedings at approximately the same time. In re Greensboro News Co., 727 F.2d 1320 (4th Cir.1984) (implicit holding)
 
 
 [6]
 The Supreme Court recognized that common-law right in Nixon v. Warner Communications, Inc., 435 U.S. 589, 597-99, 98 S.Ct. 1306, 1311-13, 55 L.Ed.2d 570 (1978)
 
 
 [7]
 As a result of the lack of disclosure, such objections will necessarily be abstract and uninformed. However, their abstraction will hardly render them valueless. Even abstract arguments will serve to remind the court of the importance of the interests that must be weighed against the government's interest in secrecy
 
 
 [8]
 The government suggests that notice of a closure motion alone could lead the news media to guess at the nature of the covert operations involved. We think that the facts of this case disprove the government's argument. First, representatives of the news media are likely to learn of the closure decision, and to speculate concerning the reasons for it, even without advance notice from the court. When a prosecution has news value, reporters will try to attend the proceedings, and they will be alerted to the court's closure decision, as Caryle Murphy was here, when they are forcibly prevented from entering the courtroom. Thus, the fact of closure itself will suggest to them that something of importance is taking place. Second, we think that the government overestimates the deductive, or intuitive, capabilities of news reporters. A newspaper simply cannot infer the nature of classified information from the mere fact that a closure motion has been filed; such an inference would have to rest primarily on information obtained from other sources. Here, the Post 's speculations were largely based on reports that several Ghanaian citizens had pled guilty to spy charges in Ghana, and that a Ghanaian diplomat had confirmed that a "spy swap" would take place
 
 
 [9]
 Because we hold that the First Amendment right of access extends to documents as well as to hearings, requests for the sealing or unsealing of documents must also be evaluated under these constitutional tests